*In re: Reco Jones*, No. 681-11-13 Wncv (Teachout, J., Mar. 25, 2019).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                                      **CIVIL DIVISION**
**Washington Unit**                                               **Docket # 681-11-13 Wncv**

**IN RE:**
**RECO JONES**

**Petition for Post Conviction Relief**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

A hearing on the merits took place on December 21, 2018.  Petitioner Reco Jones was present and represented by Attorney Mark Furlan.  State's Attorney Rory Thibeault defended the conviction.  Post-trial memoranda were filed.

Petitioner, a citizen of Barbados, challenges his February 2013 conviction and sentencing for felony sexual assault, parental role, which was based on a plea, on grounds of ineffective assistance of counsel.

Based on the evidence, the Court makes the following Findings of Fact, Conclusions of Law, and Order.

### Findings of Fact

Reco Jones is a citizen of Barbados who came to the United States in 1976 when he was 16 years old.  In June of 2012, he was arrested and charged with a sexual assault on his underage stepdaughter.  He confessed on tape.  The next day, he attempted to commit suicide and left a note in which he again confessed.  At his arraignment, his application for a public defender was denied as his wife's income was used in determining his resources.  Some days later, his application was reconsidered and granted, and Attorney Maggie Vincent, whose law firm has had the public defender contract for over 30 years, was assigned to represent him.

Ms. Vincent first learned of the assignment during a chance encounter with the prosecutor, Deputy State's Attorney Meghan Campbell, on June 25, 2012 on the sidewalk near the courthouse.  Ms. Campbell told Ms. Vincent that Ms. Vincent had been assigned to his case and that if he pled guilty, the federal immigration authorities would be at his change of plea and immediately take him into custody for deportation without even waiting for sentencing.

Ms. Vincent met with Mr. Jones a few days later at the courthouse at the time of a scheduled status conference. The charge against him was aggravated sexual assault, which carried a sentence of 25 years to mandatory life. During a conference with the judge in chambers, Attorney Campbell stated that if he changed his plea, ICE would come to take him into custody at the change of plea hearing without waiting for sentencing. Even with that expectation, she wanted to have a presentence investigation report (PSI), and because she expected that he would be picked up at the change of plea hearing, she wanted to have the PSI done prior to any change of plea. Ms. Vincent discussed the situation with Mr. Jones, whose goal was to be deported to Barbados. After talking with Mr. Jones, Ms. Vincent informed Ms. Campbell that Mr. Jones would plead guilty. The judge agreed that a pre-plea PSI could be done under these circumstances, and one was ordered. Ms. Vincent sought documentation from the State that ICE would do what had been represented.

In early July, during a telephone conference, Mr. Jones told Ms. Vincent that he had changed his mind and did not want to plead guilty but wanted to stay in Vermont and wanted to go to trial. Ms. Vincent withdrew the request for a pre-plea PSI and filed a motion for a speedy trial, which was then set for December.

In response to Ms. Vincent's request for documentation of what ICE would do in the event of a plea, Ms. Campbell gave Ms. Vincent on July 17, 2012 a Declaration written by an attorney from the Vermont Service Center of the US Immigration Service. It stated that a person convicted of sexual abuse of a minor is considered an aggravated felon, and an aggravated felon is deportable and ineligible for relief from removal. It had no information about timing of deportation beyond the statement that the "Department of Homeland Security initiates removal proceedings by issuing a notice of intent to appear before an Immigration Judge." Ms. Vincent found it insufficient. Ms. Campbell offered to put Ms. Vincent in touch with an immigration defense lawyer. Although the case was on track for trial, throughout the summer and fall Ms. Vincent urged Mr. Jones to accept the plea deal based on the representation that ICE would be at court for the plea and take him into custody. As long as his goal was to go to Barbados rather than prison, this offered the best opportunity, as he would avoid prison and have a free ticket to Barbados. If ICE officials came to the courthouse to take him into custody when he pled, his goal could be achieved, whereas if they were not there, he would not have to plead that day and could still keep his options open.

On November 5, 2012, Ms. Campbell filed a motion to continue the trial. At a hearing on the motion a few days later, the State produced copies of correspondence that Mr. Jones had had with his wife that evidenced a plan to take the stepdaughter victim out of the country to make her unavailable for trial. Without her, conviction at trial was unlikely. The motion to continue was granted and the scheduled trial date was postponed.

Ms. Campbell went on leave from work and the case was taken over by State's Attorney Tom Kelly. Ms. Vincent was in Mr. Kelly's office at one point and he got two federal attorneys on the telephone. It is unclear exactly who they were but they were

clearly staff attorneys for one of the branches of the Department of Homeland Security. It is not clear that they had any authority to negotiate any terms specific to Mr. Jones, but they said that it was not the case that ICE would take custody immediately at a change of plea hearing, but rather would wait until after sentencing and the additional window of time for the exercise of appeal rights (30 days) before initiating any removal.

To Ms. Vincent, this was a significant change as it introduced uncertainty about what would happen if Mr. Jones entered a guilty plea. It meant that he would not have the option at a change of plea hearing to change his mind if ICE was not present. Rather, he would have a mandatory life sentence and have to take chances about what would happen to him after sentencing.

By this time, Mr. Jones had learned that his wife had filed for divorce. He no longer wanted to go to trial but was interested in entering a plea.

Ms. Vincent undertook to explore options by doing the following. She checked a reference manual about immigration issues that had been created for use by Vermont public defenders by an attorney in the Defender General's office who had immigration defense experience. She learned that with a conviction for aggravated sexual assault, there was no possibility of any defense to removal that could be raised in federal immigration court during deportation proceedings. With the uncertainty of not having the deportation issue clear at a change of plea hearing, she was concerned about Mr. Jones having a mandatory life sentence.

She initiated plea negotiations with State's Attorney Kelly in an effort to reduce the certainty of a life sentence in case Mr. Jones was not deported shortly after the expiration of appeal rights. Mr. Kelly was willing to reduce the charge to Sexual Assault, Parental Role, which was still a felony but carried the lesser penalty range of 3 years to discretionary life. However, Mr. Kelly was not willing to agree to a minimum sentence as low as 3 years. He insisted on a minimum sentence of 12 years. In response to Ms. Vincent's attempts to persuade him to agree to a lower minimum, he said, "It doesn't matter what the sentence is since ICE is going to pick him up and deport him right away anyway." Mr. Kelly was relying on the same information that had been given to both attorneys during the telephone call with the two federal staff attorneys. Mr. Kelly apparently assumed that deportation would occur soon after the period of exercise of appeal rights, although the attorneys had not guaranteed that.

Ms. Vincent discussed this option with Mr. Jones. She informed him that it was clear that if he pled guilty, he would spend at least some time as a Vermont inmate because it was understood that federal custody would not be initiated at the earliest until after the appeal period had expired. Ms. Vincent advised Mr. Jones that it was not a certainty that after that period he would be taken into custody by ICE or when.

A change of plea was held on February 1, 2013, at which time Mr. Jones pled guilty to the charge of Sexual Assault, Parental Role. The judge noted that the plea agreement called for a sentence of 12 years to life but those terms were not approved at

3

that time.  Rather, the judge ordered a PSI and stated that there would be a later sentencing hearing at which time the court would determine whether to accept the agreed upon sentence, or if he determined not to accept it, Mr. Jones would be able to withdraw his plea.  At the PCR hearing, Mr. Jones testified that at the time he entered his plea, although he understood that it was not a certainty what ICE would do, he understood that it was 99.9% likely that he would be taken into federal custody for deportation some time after the expiration of the appeal period.

A sentencing hearing was held on April 11, 2013.  The transcript of the sentencing hearing shows that all parties, including the judge, understood that there was no certainty about what immigration authorities would do.

Attorney Campbell, on behalf of the State's Attorney's office, expressed concern that if Mr. Jones was deported, without treatment he would be at "high risk to reoffend" but stated that "the immigration piece is outside of our hands."

Attorney Vincent, on behalf of Mr. Jones, stated that "he does understand that what happens from here on out might be the sentence that was agreed to, but most likely is in fact that at some point—at some point in the future—he doesn't know when—he will be in fact deported.  We don't know what will happen.  He does know that, and is just waiting to see."

The judge noted that the "substantial term of incarceration is necessary" and would further the goals of deterrence, punishment, and incapacitation.  He also stated that "The terms of the agreement entered into by the parties provide for a rehabilitative component to take place within the correctional setting.  The choice of whether to complete available treatment programs is one for Mr. Jones to make.  And once he is in jail he may well conclude that he can benefit from the active and successful participation in such a program."  He also addressed the relationship between immigration consequences and the proposed sentence as follows:

> It does bear noting that the PSI identifies that Mr. Jones, who is not a citizen, faces the potential immigration consequences, and that they may impact the service of his sentence.  Such matters are beyond the control of this Court and lie within the purview of the federal government.  Irrespective of any such immigration consequences, it is the intent of this Court that Mr. Jones serve the full sentence imposed, and that he not be released until such time as he has successfully completed any required treatment program and is deemed to no longer be a threat to public safety.

He imposed the sentence previously agreed to by the parties: 12 years to life on the charge of sexual assault, parental role.

Mr. Jones has been incarcerated for approximately 6 ½ years.  Immigration authorities have never initiated any attempt to take custody of him for removal and deportation.

4

The only testimony on the standard of practice applicable to an attorney representing a client with the circumstances of Mr. Jones came from Attorney Paul Volk, who has extensive experience as a criminal defense attorney in Vermont, including with noncitizens facing immigration issues related to their criminal charges.

He testified, and the court finds, that Ms. Vincent did not meet the required standard of competent practice under the circumstances because she relied on information obtained from opposing counsel about immigration consequences and did not seek advice from either criminal defense attorneys with knowledge and experience in immigration matters or immigration defense counsel.

Specifically, she relied on information relayed to her from prosecutors in the State's Attorney's office, whose job is prosecuting criminal behavior and who are known generally to "know little and care less" about immigration proceedings. She relied on the public defender book which is a general primer on immigration matters but not a substitute for a thorough analysis of likely consequences of specific factual circumstances. She also relied on the representations of the two federal attorneys that State's Attorney Kelly got on the telephone without knowing exactly who they were or what their role was or the reliability of their representations as applied to her client. She did not consult with any experienced immigration defense attorney or defense counsel experienced with immigration matters, nor did she attempt to negotiate an arrangement with the immigration trial attorney unit lawyers in Boston, who are the ones with the authority to decide what to do in specific cases coming out of Vermont, and who will sometimes agree to sign off on a plea agreement or provide a memo of understanding in advance of a plea so that everyone can be assured of the consequences. As a result of failing to obtain knowledgeable advice, she had a misunderstanding of the impact of a sentence for twelve years to life.

Mr. Volk testified, and the court finds, that the consequence of a 12-year to life sentence for the sexual assault charge made it virtually certain that Mr. Jones would never be removed by Homeland Security and never be eligible for programming that would make release possible. This is because of the effect of the interrelationship between longstanding DOC policy and Homeland Security policy. DOC's longstanding policy was that it would not provide rehabilitation programming to a person subject to deportation because such a person would not be returning to the community in Vermont. The Parole Board would not release a non-programmed person on parole. Thus, because of the possibility of deportation, it was virtually certain that he would serve a life sentence without the possibility of rehabilitation, release, or parole. Then, because he was serving a life sentence, Homeland Security would have no reason to deport him.

Therefore, the sentence structure that was put in place as a result of the failure to fully investigate and analyze immigration consequences prior to the entry of a plea effectively resulted in a life sentence with no chance of rehabilitation or release and a minimal chance of deportation. Moreover, if he were deported, it would be without treatment.

5

The court cannot conclude that it was the intent of the sentencing judge, in approving the terms of the plea agreement, to approve an effective sentence of a life sentence without parole or opportunity for rehabilitation. While the judge might, if fully informed, choose to approve such a sentence, the lack of information about the effective consequence of the proposed sentence prejudiced his ability to make a considered judgment.

## Conclusions of Law

The standard for evaluating post-conviction claims of ineffective assistance of counsel is longstanding and well known.

> The appropriate standard for reviewing claims involving ineffective assistance of counsel is whether a lawyer exercised "that degree of care, skill, diligence and knowledge commonly possessed and exercised by reasonable, careful and prudent lawyers in the practice of law in this jurisdiction." To demonstrate ineffective assistance of counsel, a petitioner must show by a preponderance of the evidence that: (1) his counsel's performance fell below an objective standard of performance informed by prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the proceedings would have resulted in a different outcome. Unless petitioner is able to satisfy both prongs of the test, "it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." In making this showing, petitioner cannot rely on the distorting effects of hindsight, and must surpass the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance.

*In re Grega*, 2003 VT 77, ¶ 7, 175 Vt. 631 (citations omitted). The prejudice component is further described as follows:

> 'A reasonable probability [of a different outcome] is a probability sufficient to undermine confidence in the outcome." The defendant is not required . . . to show that counsel's deficient performance 'more likely than not' altered the outcome of the case. . . . On the other hand, it is not enough for the defendant 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Instead, counsel's errors must have been 'so serious as to deprive the defendant of a fair trial.' The likelihood of a different result must be substantial, not just conceivable. '[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."

Brian R. Means, Postconviction Remedies § 35:4 (footnotes omitted).

The court finds the expert opinion of Mr. Volk credible and persuasive as establishing the standard of practice for an attorney representing Mr. Jones, and further concludes that Ms. Vincent's work fell below that standard for the reasons stated by Mr. Volk.

The second part of the analysis is whether there was a substantial likelihood of a different outcome. Mr. Jones's testimony was that he knew when he entered his plea that there was no certainty that he would avoid the 12 year-to-life sentence through deportation. Although he thought the chances were very high that he would be deported, there was still a risk that it would not happen at all or any time soon, and he was aware of that risk and decided to take it. Therefore, the court cannot conclude that he was prejudiced, since the advice he received from Ms. Vincent was accurate as to the risk that he might not be deported and would wind up serving a 12 year-to-life sentence.[1]

There is another dimension to this case, however. At the sentencing hearing, the sentencing judge was in the position of determining whether to accept or reject the sentencing terms of the plea agreement. From the judge's comments above, it is clear that he intended Mr. Jones to serve at least the full twelve years if he was not deported. It is also clear that he did not want Mr. Jones to be released to the community unless he had successfully completed treatment so that he would not represent a risk in the community.

However, it appears that the judge acted on the assumption that after twelve years, treatment would be *available* to Mr. Jones, who could then make the choice whether to take advantage of it and prepare himself to return to the community. It is apparent that the judge was not aware that if Mr. Jones was not deported and was still in DOC custody after twelve years, DOC would *not* make treatment programs available to him because of his continuing eligibility for deportation. This information was not available to the judge because of Ms. Vincent's failure to investigate sufficiently to discover it.

It is unknown whether the judge, if he had had this information, would have reached a different conclusion about whether to accept or reject the terms of the plea agreement. However, it is a critical piece of information because it relates to whether treatment would ever be available to Mr. Jones, and the judge clearly assumed that treatment would become available at some point. If Ms. Vincent had met the requisite

_____

[1] There also could not have been any prejudice to Mr. Jones insofar as the deficient advice on immigration law may have caused him to miss the opportunity to withdraw from the plea agreement and proceed to trial on the charges against him. Mr. Jones has never testified that, with better legal advice on immigration consequences, he would have chosen instead to take his chances at trial. Similarly, there also could be no prejudice to the extent that a better understanding of immigration consequences should have caused Ms. Vincent to try to negotiate a different plea bargain with the prosecutor. There was no evidence that the prosecutor could have been persuaded to agree to any more favorable plea agreement or that the court would have accepted it.

7

standard of practice, the judge would have had this fundamental piece of information, and because of the importance of rehabilitative programming, it reasonably could have affected his analysis of the proposed sentence.

Mr. Jones's sentencing hearing was tainted by fundamental error.  See *In re Hemingway*, 168 Vt. 569, 570 ("Post-conviction relief is available when fundamental error is found in a court's acceptance of a plea of guilty."); see also *U.S. v. Moore*, 656 F.2d 378, 379 (8th Cir. 1981) (otherwise legal sentence may be attacked collaterally if sentencing judge relied on "improper factors"); *U.S. v. Hamilton*, 391 F. Supp. 1090, 1094 (W.D. Mo. 1975) ("Exceptional circumstances possibly requiring postconviction review of a sentence may exist upon a sufficient showing that the sentencing Judge relied upon . . . material inaccuracies.").

Section 7133 of Title 13 authorizes a court in a postconviction relief proceeding, in addition to vacating a judgment, to resentence a person "or grant a new trial or correct the sentence as may appear appropriate."  In this circumstance, what appears appropriate is to give the sentencing judge the benefit of the information that should have been available to him if Ms. Vincent had met the requisite standard of practice, so that he can consider that piece of information as part of his consideration of whether or not to approve the sentencing terms of the plea agreement.  Thus, the court will remand the case for a continuation of the sentencing hearing.

It should be clear that this court is not vacating the sentence or ruling that the sentence should not be approved.  It will be up to the sentencing judge to consider the additional information developed through this process in combination with all the other information before him.  Rather, this court is simply remanding the case to the Criminal Division for a *continuation* of the sentencing hearing before the same judge so that the judge will have the benefit of the information he otherwise should have had.


ORDER


For the reasons set forth above, the case is remanded to the Washington Criminal Division for a continuation of the sentencing hearing in Docket #664-5-12 Wncr before the Honorable Thomas A. Zonay.

Dated at Montpelier this _____ day of March, 2019.


_____
Hon. Mary Miles Teachout
Superior Court Judge

8